File Name: 05a0619n.06

Filed: July 22, 2005

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**Nos. 03-3922, 03-3923, 03-3924, 03-3925**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **ABRAHAM JAARS, DELICIA JAARS, GRANT JAARS, and ROSLEE JAARS,** | ) | |
| | ) | |
| | ) | |
| *Petitioners-Appellants*, | ) | **ON APPEAL FROM THE** |
| | ) | **BOARD OF IMMIGRATION** |
| **v.** | ) | **APPEALS** |
| | ) | |
| **ALBERTO GONZALES, Attorney General,** | ) | |
| | ) | **OPINION** |
| *Respondent-Appellee*. | | |

**BEFORE:     COLE, and CLAY, Circuit Judges; HOOD, District Judge.**[*]

**R. GUY COLE, JR., Circuit Judge.**

Petitioners appeal the Board of Immigration Appeals' denial of their asylum claims and their request to estop the Immigration and Naturalization Service ("INS") from blocking their application for suspension of deportation. For the following reasons, we **DENY** the petition with respect to Abraham, Delicia, and Grant Jaars' asylum and estoppel claims, but we **GRANT** Roslee Jaars's petition and **REMAND** her case for a hearing.

**I.**

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

The lead petitioner, Abraham Jaars, his wife Delicia, and their two children are citizens of South Africa. They identify themselves as "colored" South Africans, which in their words, means they are "mixed blood citizens." On June 11, 1986, they entered the United States on six-month visitor visas. The petitioners then overstayed these visas. In 1988, Abraham filed an application for asylum on behalf of himself and his family, alleging past persecution under the South African apartheid regime. On September 13, 1989, the INS[1] notified Abraham that it intended to deny his asylum application, but that he could submit additional evidence in support of his claim. On October 5, 1989, Abraham submitted additional evidence to the INS. The INS took no further action on Abraham's application until August 1998, when it denied his application and sent him a Notice to Appear for removal proceedings.

During the nine-year period that Abraham and his family were waiting for INS action, the Jaars family lived in the United States. Abraham's children, Roslee and Grant, were ten and five years old, respectively, when they entered the United States. In 1999, Roslee filed her own independent asylum application, because by that time she was too old to depend on her father's application. At the removal proceedings, the petitioners moved to consolidate Roslee's case with her family's case, claiming that "No additional facts would be necessary to resolve Roslee's claim." The immigration judge denied their request. Accordingly, Abraham, Delicia, and Grant proceeded with their hearing separately from Roslee.

---

[1] On March 1, 2003, the INS was reorganized and became part of the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107-296, 441, 116 Stat. 2135, 2192, 2205 (codified at 6 U.S.C. § 101, *et seq.*). This opinion will refer to that agency by its prior acronym, INS.

At the hearing, petitioners made the following two arguments: (1) that although the apartheid regime fell while they were in the United States, they have a well-founded fear of being economically persecuted by the new South African Government; and (2) that the INS should be equitably estopped from preventing the petitioners from applying for suspension of deportation because the INS unreasonably delayed in processing and denying their asylum application.

Regarding petitioners' economic persecution argument, Abraham testified that the African National Congress ("ANC") had established aggressive policies that were designed to benefit black South Africans, but not colored South Africans. The State Department's 2000 Country Report for South Africa briefly states that the ANC passed the Employment Equity Act of 1998, which created a program (hereinafter "the Program") designed to benefit previously disadvantaged groups. The Report notes that the Employment Equity Act defines "disadvantaged groups" as "blacks, women, and the disabled." Under the Program, employers with fifty or more employees must submit plans to the Government ensuring that such previously disadvantaged groups are adequately represented. The State Department Report also notes that in 2000, the unemployment rate in South Africa was 23%. Otherwise, the Report does not specifically address the economic situation of colored South Africans.

Abraham testified that he spoke to three people who reside in South Africa: Kevin Hinkle (Abraham's relative), Elizabeth Van Nierka (Abraham's sister), and Donald Baatjies (Abraham's friend). Based on his conversations with these individuals, Abraham believes that it will be impossible for him to find employment in South Africa as a roofer—his current line of

employment—because the Program mandates that black South Africans be given preference for employment.

Baatjies told Abraham that the Jaars would be immediately recognized as "American" from their manner of speaking, which would make it even more difficult for them to find employment and housing because of the growing anti-American sentiment in South Africa. Abraham stated that if he returned to South Africa, he would speak favorably of America and, as a result, he believes he would be hurt or killed by Muslims. Additionally, Clemont Arendse, who is Delicia's brother, testified that he recently visited South Africa for six weeks and he feared that the Jaars's children would not be able to function well in South Africa because everyone there must speak the Cosa language. However, Abraham conceded that most people in South Africa understand English.

Abraham also learned that there have been violent struggles between black and colored South Africans over housing. Arendse testified that there was a growing problem with black South Africans squatting on land that belonged to colored South Africans, and the Government would not remove these individuals. Petitioners supplemented their testimony with various newspaper articles discussing general economic conditions in South Africa.

Ultimately, the immigration judge denied Abraham's asylum claim, as well as his request to estop the INS from precluding him from filing a suspension of deportation application. Curiously, despite the fact that the judge previously denied Roslee's request to consolidate her case with her father's case, the immigration judge *sua sponte* denied Roslee's asylum claim along with Abraham's claims. The BIA summarily affirmed the immigration judge's decision without opinion.

**II.**

When the BIA affirms the immigration judge without issuing its own opinion, we review the immigration judge's decision as the final agency decision. *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). The standard for reviewing an immigration judge's factual findings in asylum cases is deferential: factual findings are conclusive, unless the Court determines that the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992). We review *de novo*, however, an "alleged due process violation based on the manner in which an IJ conducts a deportation hearing." *Castellano-Chacon v. INS*, 341 F.3d 533, 552 (6th Cir. 2003).

## A. The Asylum Claim

An applicant may obtain asylum under Section 208(a) of the Immigration and Nationality Act if he shows that he is a "refugee," meaning he is unwilling or unable to return to his home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The applicant must establish that he has both a subjective and an objective fear of persecution. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005).

### 1. Economic Persecution

Petitioners argue that a confluence of circumstances give rise to their well-founded fear of economic persecution. First, they argue that the Program was developed to help black South Africans to the detriment of colored South Africans. Given the high unemployment rate in South Africa, petitioners contend that colored South Africans will suffer as a result of the Program. To make matters worse, after having lived in the United States for over a decade, petitioners have

become "Americanized" and therefore feel that they would face increased economic persecution and possible violence from anti-American Muslims living in South Africa. Furthermore, Abraham is almost sixty years old and thus claims that he will face increased difficulty in finding employment. Given the sum of these circumstances, petitioners believe that the Program renders it almost impossible for them to find employment and housing in South Africa.

The immigration judge denied petitioners' asylum claims. The judge found that to constitute persecution, a government's conduct must be of the type universally rejected by civilized governments around the world. The Program, the judge noted, has not been condemned, and in fact, the United States itself has similar programs.

At the outset, the Government argues that this Circuit "has never held that economic problems can be a basis for a grant of asylum." However, in *Berdo v. INS*, 432 F.2d 824 (6th Cir. 1970), we stated that "a probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion is sufficient to confer upon the Attorney General the discretion to withhold deportation." *Id*. at 846 (quoting *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969). In *Berdo*, we held that where the petitioner was forced to accept membership in the Hungarian Communist Party in order to avoid "deliberate imposition of substantial economic disadvantage as a defector," the petitioner had suffered persecution. *Id*. at 847. It should be noted that the Court also found that the petitioner would "probably be subjected to imprisonment and . . . in all probability face, a sentence of death" if he were deported. *Id*. Nonetheless, the Court considered economic persecution as a valid form of identifiable persecution on which a petitioner could base his asylum claims. *See also Chen v. Ashcroft*, No. 03-3937, 2004

WL 2452559, *3 (6th Cir. 2004) (unpublished). In *Chen*, the petitioner claimed that she would suffer economic persecution because the Chinese government barred her from pursuing education beyond the sixth grade, possibly because her parents violated family planning policies. *Id*. at *3. We held that the petitioner's plight did not constitute economic persecution. *Id*. The Court distinguished Chen's case from *Berdo* on two grounds: Berdo's government directly deprived him of employment; and it did this in order to compel him to become a member of the Communist Party. In Chen's case however, the Chinese government's denial of Chen's education would not directly curtail her employment prospects, and it was unclear from the record that this denial of education was done because Chen's parents had violated China's family practice policies. *Id*. at *3-4.

Several other circuits have held that economic harm could, in some circumstances, be severe enough to qualify as persecution. *See, e.g.*, *Gormley v. Ashcroft*, 364 F.3d 1172, 1177 (9th Cir. 2004) ("We have recognized that purely economic harm can rise to the level of persecution where there is 'a probability of deliberate imposition of substantial economic disadvantage' upon the applicant on account of a protected ground . . . . In *Kovac*, we determined that when Congress deleted the word 'physical' from the description of persecution in section 243(h) of the INA, it implicitly provided that economic persecution alone could sustain an asylum claim.") (citations omitted); *Borca v. INS*, 77 F.3d 210, 217 (7th Cir. 1996) (remanding petitioner's asylum case back to the BIA where she showed that the Romanian government deprived her of all employment other than farm labor); *Abdel-Masieh v. INS*, 73 F.3d 579, 583 (5th Cir. 1996) ("The harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life.")

(citing the BIA's decision in *Matter of Laipenieks*, 18 I. & N. Dec. 433, 456-57 (BIA 1983)). Thus, we may properly consider the petitioners' claim of future economic persecution.

Although we will address the petitioners' arguments in detail, our essential conclusion is that while petitioners undoubtedly fear hardship, this fear does not translate into a well-founded fear of *persecution*. First, petitioners rely on a legitimate proposition to make an interesting, but ultimately incorrect, argument. They note that an alien can show a well-founded fear of future persecution by showing a less than 50% chance of the persecution actually occurring, and in some cases, even a 10% chance will suffice. *See Perez-Alvarez v. INS*, 857 F.2d 23, 25 (1st Cir. 1988) ("If one out of 10 adult male persons in the petitioner's country of origin is either in danger of death or of incarceration in "some remote labor camp," the petitioner has a 'well-founded fear' of persecution.") (citation omitted). Petitioners then argue that if they show that there is even a 10% chance they will be unable to find housing or employment, they have met their burden of establishing a well-founded fear of future persecution. This argument sidesteps the underlying question of whether the Program, with all its possible consequences, constitutes "persecution" at all. Taken to its logical conclusion, petitioners' argument means that any South African who is not favored by the Program may face a 10% risk of persecution, given the 23% rate of unemployment. The proper way to review petitioners' claims is to examine whether the policies of the ANC and the general housing shortages constitute "persecution" of which one could have a well-founded fear.

While no court has articulated a clear rule as to what constitutes economic persecution, the sum of case law indicates that at minimum, a petitioner must demonstrate that the potential economic disadvantage is deliberately imposed as a form of punishment; is imposed directly; and

amounts to more than discrimination. *See Gormley*, 364 F.3d at 1177 (denying asylum to white South Africans who claimed that the Program was an economic disadvantage, because the Program was not designed as a means of economic persecution; rather, it was designed to "not trample on the rights of non-designated groups," as employers cannot "require the dismissal of non-designated groups and their replacement with designated . . . employees") (citations omitted); *Borca*, 77 F.3d at 216 (noting that "the economic harm required under *Kovac* must be 'deliberately imposed' as a form of punishment") (citations omitted); *Chen*, 2004 WL 2452559, at *3 (denying asylum to Chinese petitioner who was denied education because a denial of education did not directly curtail her occupational prospects); *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) (noting that "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the Act").

Thus, the courts have found potential economic persecution in cases like *Berdo*, where the petitioner had been forced by the Communist regime to join the Party or else not be able to obtain employment. *See* 432 F.2d at 824. Similarly, economic persecution was found in *Borca*, where the petitioner was actively speaking out against the Romanian government and the government then fired her and barred her from all government employment save farm labor. 77 F.3d at 210. The petitioner does not have to prove that he would be deprived of *all* means of employment in order to show persecution. *See Berdo*, 432 F.2d at 846. However, he must prove that the potential persecution is purposeful, direct, and substantial.

Against this legal backdrop, the petitioners' evidence does not compel the conclusion that they have a well-founded fear of economic persecution in South Africa. Petitioners have not shown

that the Program was created with the purpose of harming colored South Africans. Abraham testified that he believed that the ANC did not include colored people in the Program because colored South Africans believe that the ANC is a Communist regime. However, petitioners provide no evidence to support this bare allegation.

Next, petitioners have not shown how the Program directly denies them employment. The Program does not require that all jobs go to black South Africans, women, and the disabled; rather, it requires that a representative portion of the jobs go to those groups. The newspaper articles provided by petitioners do not support their assertions that it will be nearly impossible for them to find jobs. To the contrary, the articles—most of which were authored before the advent of the Program—speak only generally about unemployment in South Africa. In any case, these articles indicate that colored South Africans can find employment. (J.A. 229) ("Labor in western cape is comprised almost exclusively of the colored community."); (J.A. 239) (noting that "Coloureds and Asians have served in the SADF [South African National Defense Force] on an integrated basis," though they may not have been promoted in accord with their percentage in the force). Additionally, as the Government notes, employers with less than fifty employees are exempt from the Program altogether. While such an employment policy may make it more difficult for a group not favored by the Program, it does not directly deprive disfavored groups of employment, just as the deprivation of education in *Chen* did not directly deprive the petitioner of employment.

The same analysis applies to petitioners' argument that they will face difficulties in obtaining housing. While there is no government plan for housing, petitioners claim that there have been violent struggles between black and colored South Africans over housing and that the police

typically refuse to remove blacks who steal the housing of others. However, the articles presented by petitioners on this point merely indicate that there continue to be violent struggles over housing; they do not indicate government acquiescence toward such behavior. Even with the testimony of Arendse, petitioners have not shown that the South African government purposefully deprives colored South Africans of housing as a form of punishment. Although petitioners' subjective fears may be credible, petitioners must show that they objectively fear persecution, not a mere disadvantage. Petitioners have not made such a showing.

### 2. Physical Persecution

Petitioners discuss the high levels of violence in South Africa as a factor contributing to their fear of persecution. Petitioners argue that their Americanized ways will make them particularly vulnerable to violence by anti-American Muslims. Petitioners do not provide anything other than a generalized assertion on this point. Moreover, petitioners' witness, Arendse, was neither harmed nor threatened when he returned to South Africa to travel the country and preach at several churches, despite the fact that he is a colored South African who had lived in the United States for over a decade. If anything, Arendse's testimony supports a finding that the Jaars will likely not face physical persecution in South Africa on account of them being "Americanized."

Although petitioners submitted newspaper articles which indicate that violence and crime are on the rise, nothing in these articles suggests that the violence is race-based. The simple fact that violence abounds in South Africa is not by itself enough to meet the requirements for asylum. *See Campos-Guardado v. INS*, 809 F.2d 285, 290 (5th Cir. 1987) ("Congress did not intend to confer eligibility for asylum on all persons who suffer harm from civil disturbances . . . ."). There is no

evidence of general violence against colored South Africans or those who have lived in America for a long period of time. Therefore, the evidence does not compel the conclusion that petitioners have a well-founded fear of physical persecution on account of them being colored or "Americanized."

**B. The Estoppel of Deportation**

Petitioners argue that even if their asylum claim were properly denied, they should be permitted to apply for "suspension of deportation" despite the fact that the "suspension of deportation" remedy was replaced with the "cancellation of removal" application in 1996. Petitioners contend that the INS should be equitably estopped from preventing them from applying for suspension of deportation relief.

Equittable estoppel is a remedy that generally exists when one party detrimentally relies on another party's affirmative misconduct. *See Santiago v. INS*, 526 F.2d 488, 492 (9th Cir. 1975) (*en banc*). As an initial matter, it is unclear whether equitable estoppel can apply against the INS for its misconduct during a pending asylum application. *See INS v. Miranda*, 459 U.S. 14, 19 (1982) (reserving ruling on "whether affirmative misconduct in a particular case would estop the Government from enforcing the immigration laws"); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 421-24 (1990) ("Our own opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government. . . . We leave for another day whether an estoppel claim could ever succeed against the Government."). However, even if we assume, without deciding, that the equitable estoppel doctrine can be applied against the INS, *see Miranda*, 459 U.S. at 19 (entertaining a claim of equitable estoppel in the asylum context), the petitioners would not succeed in their

- 12 -

particular equitable estoppel claim because they were—and are still—unable to show affirmative misconduct by the INS.

Petitioners' argument is a bit convoluted. Petitioners argue that had the INS denied their asylum claims *and* instituted deportation proceedings against them sometime after 1993, but before 1996, they would have been eligible for "suspension of deportation." Until 1996, an alien could apply for suspension of deportation if he showed continuous presence in the United States for seven years, good moral character, and extreme hardship. 8 U.S.C. § 1254(a)(1). However, in 1996, Congress replaced "suspension of deportation" with "cancellation of removal," which has slightly stricter eligibility requirements that the Jaars argue they cannot meet. Thus, petitioners argued to the immigration judge that the INS's delay in processing Abraham's application and placing the petitioners into removal proceedings prejudiced them because they could no longer apply for suspension of deportation in 1998. The judge summarily dismissed petitioners' motion for equitable estoppel on these grounds and did not permit them to present any evidence on this point. The immigration judge reasoned that estoppel is only warranted when there is proof of affirmative misconduct, and petitioners would not be able to prove such misconduct because they were not planning on questioning anyone from the INS. Petitioners now argue to this Court that the immigration judge's refusal to allow them to present other evidence on their estoppel claim is reversible due process error requiring a remand.[2] Thus, we must determine whether the immigration

---

[2] Petitioners do not argue that this Court should directly grant them equitable estoppel.

judge improperly excluded evidence on the estoppel issue and whether such exclusion prejudiced

the petitioners. *See Amadou v. INS*, 226 F.3d 724, 727 (6th Cir. 2000).

### 1. Excluded Evidence

In reviewing petitioners' claims, we conclude that the immigration judge did not err by

excluding evidence on the estoppel issue, because the only evidence which the petitioners attempted

to present was the simple fact that the INS delayed in acting on their petition while acting on other

petitioner's applications. Because an equitable estoppel claim requires a showing of affirmative

misconduct and mere delay does not constitute affirmative misconduct, the immigration judge

properly dismissed this argument without further evidence.[3]

The Government correctly argues that mere delay in responding to an application is not

enough to prove affirmative misconduct. *See INS v. Miranda*, 459 U.S. 14, 18 (1982) (finding that

an eighteen-month delay by the INS in processing the respondent's application was not affirmative

misconduct); *Ventosa v. Ashcroft*, 92 Fed. Appx. 859, 862 (3d Cir. 2004) (non-precedential opinion)

("The approximate eight-year interval it took the INS to address the Ventosas' asylum application,

though an unfortunate delay, does not constitute affirmative misconduct sufficient to estop the INS

from preventing the Ventosas from applying for suspension of deportation relief."); *Kowalczyk v.*

---

[3] The immigration judge may have implied, incorrectly, that the petitioners could only prove affirmative misconduct by deposing INS agents. There are other forms of evidence that petitioners could have presented to show affirmative misconduct, such as evidence that the petitioners contacted the INS during the delay about their status and the INS ignored them. Petitioners here, however, did not allege any other such evidence of affirmative misconduct. In any case, no prejudice resulted from the immigration judge's implications because even on appeal, the Jaars have not proffered any other evidence that they would have presented to the immigration judge.

*INS*, 245 F.3d 1143, 1150 (10th Cir. 2001) (denying equitable estoppel to a petitioner even though the BIA delayed processing his appeal for nine years and petitioner's co-workers' applications were disposed of relatively quickly); *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000) (finding that the Government's failure to act is not an affirmative act and therefore cannot constitute affirmative misconduct); *Moosa v. INS*, 171 F.3d 994, 1003 (5th Cir. 1999) (finding that "to state a cause of action for estoppel against the government, a private party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline") (quotation omitted).  Thus, mere delay, even when other similar applications were dealt with in a more timely fashion, is not enough to prove affirmative misconduct.  *See Kowalczyk*, 245 F.3d at 1150.  Consequently, the immigration judge did not err by denying petitioners' claim on this issue, because petitioners made no proffer to the judge that they would be presenting any evidence other than the fact of the delay and that other applications were dealt with in a timely manner.

Furthermore, it is not clear how petitioners could establish an equitable estoppel claim where the INS's conduct would not necessarily have harmed the petitioners.  Petitioners' argument, that the INS's delay prevented them from filing a suspension of deportation application, suffers from a fatal disconnect.  As the Government notes, had there been no delay or even up to a three-year delay before the INS immediately instituted deportation proceedings against petitioners, they would not have been eligible to apply for suspension of deportation because they would not have met the statutory requirement of continuous presence in the United States for seven years.  Petitioners are trying to claim that the INS's nine-year delay was unwarranted and therefore equivalent to affirmative misconduct, but they want to be reinstated to a position where the INS delayed at least

three to four years before instituting deportation proceedings against them. This set of facts makes the argument of detrimental reliance untenable.[4]

## 2. Prejudice

Even if the immigration judge should have permitted the Jaars to present evidence on their estoppel claim, the immigration judge's error caused no prejudice to the petitioners. As previously noted, the petitioners have made no proffer to this Court of what other evidence they would have presented to the immigration judge, had they been given the chance, that would have proven the INS's affirmative misconduct. The fact that there was a nine-year delay between the last communication on Abraham's asylum application and the commencement of removal proceedings, and that similar asylum applications were dealt with more quickly, is not enough to invoke equitable estoppel against the Government. Because the petitioners have not alleged that they would have presented other evidence in support of their equitable estoppel claim, any error by the immigration judge was not prejudicial, and therefore was not a due process violation. *Castellano-Chacon*, 341 F.3d at 553 (finding that immigration judge's error was harmless unless petitioner can identify specific prejudice).

## C. The Consolidation of Roslee's Case with her Family's Case

---

[4]*Aoun v. INS*, 342 F.3d 503, 507 (6th Cir. 2003), is not applicable here. In *Aoun*, the petitioner filed an application for suspension of deportation in 1987; however, the INS delayed in hearing that application for nearly sixteen years, during which the rules for suspension of deportation changed. *Aoun*, 342 F.3d at 507. This Court held that the petitioner had a settled expectation when he filed his suspension of deportation application that the rules in existence at that time would be applied. *Id.* On the contrary, here, petitioners never filed a suspension of deportation application, and thus had no settled expectation of when they would receive a deportation order, and what law would be applicable to it.

An alien is entitled to a full and fair hearing on her immigration claims. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001). Here, Roslee argues that the retroactive consolidation of her case with her family's case violated her right to a full and fair hearing because the immigration judge did not permit her to testify, explicitly stating that her case would not be consolidated with her family's, that the hearing was "not her case," and that "This is not her claim." Nonetheless, after the hearing, the immigration judge consolidated Roslee's claim without giving her the opportunity to testify on her own behalf.

The Government notes that in order to show a due process violation, one must show that she was prejudiced by the violation. Roslee does not claim that she would have presented additional evidence that, had she the opportunity to testify, might have changed the ultimate outcome of the case. Additionally, at the beginning of the hearing, when petitioners initially moved for consolidation of the cases, petitioners' counsel stated that "Mr. Jaars [sic] case and claim is exactly the same as the other members of the Jaars family. No additional facts would be necessary to resolve Roslee's claim." (J.A. 191) Therefore, the Government argues, Roslee's participation in the hearing would have been irrelevant, and although the immigration judge denied the motion for consolidation and declared that Roslee's case would proceed at another time, Roslee suffered no prejudice by the retroactive consolidation of her claims.

An immigration judge has broad discretion in how she conducts a petitioner's hearing. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). Whether the hearing is fair, and thus the process provided is *adequate*, depends upon whether the petitioner shows prejudice. However, when a person has no hearing or opportunity to be heard whatsoever, the process is automatically

inadequate. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions"); *Daniels v. Williams*, 474 U.S. 327, 339 (1986) (Stevens, J., concurring) (distinguishing two types of due process claims: (1) a claim that a hearing has not even been held, and (2) a claim that although some process has been provided, it is fundamentally flawed). The immigration judge has no discretion in whether to afford notice and an opportunity to be heard; such requirements are the bare minimum of due process. In this respect, Roslee's due process claim is vastly different from petitioners' estopel claim. In the previously discussed argument, petitioners claimed that their due process rights were violated because they were not afforded the opportunity to submit certain evidence at their hearing to support their claim. They were arguing then that their hearing was flawed because the process was inadequate and prejudicial. In Roslee's case, however, she was deprived of a hearing altogether—her claim was not consolidated with her family's claim and she was explicitly barred from testifying on her own behalf. As Roslee was given no process whatsoever, we REVERSE the BIA's decision on her claim and REMAND her case for a hearing.

## III.

We must acknowledge the roots that the Jaars family have undoubtedly planted in their community during the almost twenty years they have spent in the United States. By all accounts, the Jaars are productive members of our society who have come to know this country as their home. Although we are compelled under the law to deny Abraham's asylum and estoppel claims, we do so with great difficulty, as this result appears pointless and unjust. *Cf. Munoz v. Ashcroft*, 339 F.3d

950, 958-959 (9th Cir. 2003). We trust that the appropriate officials in the executive branch will examine the Jaars' situation carefully and, at a minimum, consider indefinitely deferring enforcement of the deportation order against a family who spent nearly a decade awaiting a response from the immigration authorities on their claim for safe haven in America.

**IV.**

For the foregoing reasons, we hereby **DENY** the petition for review with respect to Abraham, Delicia, and Grant Jaars, and **GRANT** Roslee Jaars's petition, **REMANDING** her case for a hearing.