*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0305P (6th Cir.)
File Name: 03a0305p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

NEMER AHMAD AOUN,
　　　　　*Petitioner,*

　　　*v.*

IMMIGRATION AND
NATURALIZATION SERVICE,
　　　　　*Respondent.*

No. 01-4004

On Appeal from the Immigration Board of Appeals.
No. A26-479-479.

Submitted: January 30, 2003

Decided and Filed: August 26, 2003

Before: MARTIN, Chief Circuit Judge; MERRITT and
LAY,[*] Circuit Judges.

———————

## COUNSEL

**ON BRIEF:** Richard G. Lehr, RICHARD G. LEHR &
ASSOCIATES, Centerline, Michigan, for Petitioner. James

———————

[*] The Honorable Donald P. Lay, Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

---

A. Hunolt, Papu Sandhu, UNITED STATES DEPARTMENT
OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION,
CIVIL DIVISION, Washington, D.C., for Respondent.

———————

## OPINION

———————

MERRITT, Circuit Judge. Nemer Ahmad Aoun appeals
the denial of his Motion to Reopen and Remand his
application for Suspension of Deportation. The equities of
the case warrant reversal of the Board of Immigration
Appeals' denial and a remand for further proceedings. The
Board's decision in this matter failed to take into
consideration lengthy delays, including continuances and an
"administrative closure" in the proceedings, that delayed a
decision on Aoun's application for many years and ultimately
prejudiced his ability to have his application for suspension
of deportation decided before more stringent immigration
rules came into effect.

Aoun raises three issues on appeal: (1) whether the denial
of the reopening of his application for suspension of
deportation based on the "stop time rule" was error;
(2) whether the Board erred in failing to allow petitioner to
apply for "repapering" and cancellation of removal and
(3) whether the Board erred in denying petitioner's
application for asylum.

### I.

Aoun entered the country legally from Lebanon in October
of 1978 on a student visa. Aoun is a Shiite Muslim who, as
a Palestinian, describes himself as "stateless." Aoun
graduated from the University of Detroit in May 1983 with a
degree in electrical engineering. In the winter of 1983-84, he
registered as a full-time student at Eastern Michigan
University with the intention of studying computer science,

but dropped out for financial reasons. Aoun therefore became deportable for failure to comply with the conditions of his status which required him to be a student if he wished to remain in this country legally. Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) and § 1251 (a)(9). Aoun then contacted the INS seeking to adjust his status. He did not wish to return to Lebanon because, among other things, the country was engaged in war at that time.

Aoun claims that, upon contacting the INS, he was put in contact with John Owens of the investigations unit of the INS. Aoun claims that Mr. Owens told him that his status could be adjusted if he helped the INS gather information about certain people, mostly fellow Lebanese in the Detroit area. In exchange for the assistance, the INS extended Aoun's visa on a month-to-month basis. Aoun claims that he was also in contact with the FBI and CIA and that the CIA asked him to attend local meetings of the Palestine Liberation Organization and Shiite Muslim groups. He also claims he was asked to return to Lebanon as an agent for the United States but he declined. When Aoun lost his car and could no longer attend the meetings and gather information, the INS stopped the monthly renewal of his visa. *See* Transcript of June 10, 1986 hearing. While we have no reason to doubt Aoun's testimony, most of the testimony concerning his work for the United States government is uncorroborated and not particularly relevant to our decision in this case except to highlight the role of the United States government in raising Aoun's expectations that by helping the government he would be able to remain in this country permanently.

In November 1984, Aoun sought asylum in the United States. He based his asylum application on the fact that he would be persecuted if returned to Lebanon because he was a "stateless person" as a Palestinian and because people in Lebanon would know he provided information about fellow Arabs to the United States government. His asylum application was denied in July 1985 and, one month later, in

August 1985, he was served with an Order to Show Cause why he was not deportable.

At his deportation hearing on June 10, 1986, Aoun withdrew his suspension of deportation application based on his attorney's erroneous assumption that a one day trip by Aoun to an amusement park in Canada in 1981 broke Aoun's seven years of "continual physical presence" in the United States, a requirement for demonstrating eligibility for suspension of deportation.[1] Aoun's asylum application and application to withhold deportation were both denied on June 10, 1986, and Aoun filed timely appeals to the Board of Immigration Appeals. In December 1987, Aoun filed his appellate brief concerning the denial of his asylum application and the denial of his application to withhold deportation and, recognizing that the earlier withdrawal of the application for suspension of deportation had been based on an erroneous understanding of the law, moved to remand his case to afford him the opportunity to reapply for suspension of deportation. Before the Board ruled on the appeals, the proceedings were "continued indefinitely" so that Aoun could pursue legalization. Order of Board of Immigration Appeals, Apr. 26, 1988. The Order stated that the appeals could be "reinstated" upon written request by either party. On January 20, 1989, the INS requested that the appeal be recalendared and reinstated because Aoun had not filed for legalization by May 4, 1988, and, in any event, was ineligible because Aoun was not out of status before January 1, 1982, as required by statute. 8 U.S.C. §1255a (a)(2)(B) (1986).

The next document in the record before us is a "Motion to Recalendar Appeal" filed by the INS on December 14, 1993. The Motion states that "the [INS] believes that the appeal was administratively closed by the Office of the Chief

---

[1] Generally, brief, casual trips out of the country, such as Aoun's one-day trip to Canada to visit an amusement park with friends, do not destroy an alien's continuous physical presence in the United States.

Immigration Judge because [Aoun] is a native of Lebanon of Palestine descent and because Lebanon was designated by the Attorney General under the Temporary Protected Status program[, which was terminated for Lebanon on April 9, 1993].”[2] On June 9, 2000, the Board of Immigration Appeals issued an Amended Order[3] reinstating the proceedings, dismissing Aoun's appeal and denying his motions for remand and for oral argument. No explanation was given for the extensive time lapse between the motion to reinstate Aoun's appeal in April 1993 and the order on June 9, 2000. In that order, the Board allowed Aoun 90 days to file a Motion for Reopen his application for suspension of deportation and Aoun filed a timely Motion to Reopen and Remand on June 21, 2000. The Board summarily denied Aoun's Motion on August 21, 2001, noting only that Aoun's physical presence in the United States began on October 18, 1978 and ended with an Order to Show Cause on August 15, 1985, thereby making him ineligible for suspension due to less than seven years' continuous physical presence.

## II.

In 1996, Congress amended the Immigration and Nationality Act by enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, 110 Stat. 3009, 3009-627 (1996). Prior to 1996,

---

[2]No document administratively closing Aoun's proceeding was included in the record before us. We rely on the government's reference to the closure contained in the Motion to Recalendar Appeal, filed by the INS on December 14, 1993: “The Service *believes* that the appeal was administratively closed by the Office of the Chief Immigration Judge because [Aoun] is a native of Lebanon of Palestinian descent and because Lebanon was designated by the Attorney General under the Temporary Protected Status program.” (Emphasis added.) This statement indicates that the INS is not sure itself why exactly why the proceeding was closed. (J.A. at 11)

[3]The June 9 Order amended a May 11, 2000 order where the names of counsel for Aoun and the INS were inadvertently substituted.

---

suspension of deportation was a form of relief from deportation. Before new laws were enacted in 1996, an alien was eligible for suspension of deportation if (1) he or she "ha[d] been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [the] application" for suspension of deportation; (2) he or she was a "person of good moral character"; and (3) deportation would result in "extreme hardship" to the alien or to an immediate family member who was a U.S. citizen or a lawful permanent resident. Immigration and Nationality Act § 244(a)(1), 8 U.S.C. § 1254(a)(1).

With the 1996 amendment, Congress changed many aspects of immigration law, including replacing “deportation proceedings” with “removal proceedings” and, correspondingly, replacing “suspension of deportation” with “cancellation of removal.” Cancellation of removal provides the same general relief as suspension from deportation, but the eligibility requirements are somewhat stricter. The new law became effective on April 1, 1997. A key change in the law under the amendment concerned the calculation of time of an alien's “continuous physical presence” in the United States. Prior to the 1996 amendment, accrual of “continuous physical presence” could continue *while the alien was in deportation proceedings*. After passage of the amendment, the initiation of deportation proceedings “stopped the clock” on an alien's accrual of time to satisfy the “continuous physical presence” requirement. Under the amendment, "any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear" or when the alien is convicted of one of several specified offenses, whichever is earliest. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 309(c)(5), 110 Stat. 3009, 3009-627 (1996), Immigration and Nationality Act § 240A (d)(1), 8 U.S.C. § 1229b(d). This is referred to as the "stop time" rule.

Although most of the 1996 amendments do not apply to aliens such as Aoun, who were placed in deportation proceedings before the effective date of the 1996 Act (April 1, 1997), the amendments did create special transitional rules for those aliens, like Aoun, in proceedings as of the Act's effective date. Confusion arose from this provision because the term "notice to appear" was not in use before April 1997, the effective date of the 1996 Act. In an effort to clear up some of the confusion, Congress passed the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, § 203(a), 111 Stat. 2160, 2196-2198 (1998). Section 203(a)(1) of the amendment, entitled "Transitional Rules with Regard to Suspension of Deportation," amended Section 309(c)(5) of 1he 1996 Act.[4] This new amendment clarifies that the stop time rule for determining an alien's continuous presence "shall apply to orders to show cause . . . issued before, on, or after the effective date of the enactment of this Act." Nicaraguan Adjustment and Central American Relief Act § 203(a)(1).[5] In *Matter of Nolasco*, Int. Dec. 3385, 1999

---

[4] (5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.-- Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

[5] (1) IN GENERAL.--Section 309(c)(5) of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (Public Law 104-208; division C; 110 Stat. 3009-627) is amended to read as follows:
   (5) TRANSITIONAL RULES WITH REGARD TO SUSPENSION OF DEPORTATION.--

   (A) IN GENERAL.--Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause (including those referred to in section 242B (a)(1) of the Immigration and Nationality Act, as in effect before the title III-A effective date), issued before, on, or after the date of the enactment of this Act.

Nicaraguan Adjustment and Central American Relief Act, Pub.L. No.

---

WL 261565 (BIA 1999) (en banc), the Board determined that the unambiguous language of the 1998 amendment, as well as the legislative history, demonstrated that Congress intended for the time stop rule to apply to the suspension of deportation proceedings pending as of April 1, 1997, the date the 1996 Act took effect. We have held that Congress intended to apply the time stop rule to orders to show cause pending at the time the 1996 Act became effective. This rule has been given retroactive effect and therefore applies to petitioner here even though he otherwise falls under the old rules. *Bartoszewska-Zajac v. INS*, 237 F.3d 710, 713 (6th Cir. 2001) (stop time rule applies to pending applications for suspension of deportation in which orders to show cause had been issued).

### III.

The Board denied Aoun's application because he could not make a *prima facie* case for eligibility for suspension of deportation for failure to meet the seven year requirement for continuous physical presence. Aoun has been in this country continuously for almost 25 years. He filed his current application for suspension of deportation in December 1987.[6] Had Aoun's application not been delayed by an "administrative closure" of his application by the INS in the late 1980s, he would have had his application ruled on well before the new rules took effect in 1997 and he would have been subject to the former rule that allowed him to accrue time towards continuous physical presence during the pendency of the proceedings. Under those rules, he would have accrued at least 10 years continuous physical presence

---

105-100, § 203(a), 111 Stat. 2160, 2196-2198 (1998).

[6] As stated above, Aoun first filed an application for suspension of deportation in 1984, but withdrew his application in 1986 based on erroneous information from his lawyer concerning the continuous physical presence requirement.

in the United States by 1989, easily meeting the seven-year requirement for continuous physical presence. As a result of the INS's "administrative closure" of Aoun's appeal, he was denied the benefit of the earlier, more lenient rules concerning accrual of time towards continual physical presence in the United States. Because the "administrative closure" of his proceeding was not the fault of Aoun, he should not suffer the extremely adverse results that flowed from that decision. Considering the unfairness that would result from applying the stop time rule retroactively in this case, we reverse the Board's decision and remand for further proceedings that allow Aoun's application for suspension of deportation to be considered on the merits.[7]

The Board's decision contains no discussion of the myriad of events and circumstances that occurred between the issuance of the Show Cause Order in 1985 and the final order *sixteen years later*. Most important, there is no discussion of the fact that, but for numerous delays, including some caused by the INS and its rules, Aoun most likely would have had his application for suspension of deportation, for which he reapplied in December 1987, acted on well before the law changed in 1996. These delays prejudiced Aoun by subjecting him to the new rules, which "stopped the clock" with the 1985 Show Cause Order instead of allowing him to continue to accrue "continuous physical presence" in the United States under the pre-1996 law.

---

[7]Our holding finds only that the stop time rule does not apply to Aoun in this case. We make no finding on the merits of Aoun's application. Further consideration of Aoun's request to remain in this country legally may take the form of a reopening of his application for suspension of deportation without consideration of the time stop rule, termination of deportation proceedings and institution of cancellation of removal proceedings, including "repapering," or any other proceeding not inconsistent with this holding. We also do not decide whether Aoun could accrue the requisite seven years in a period of continuous presence starting after the recalendaring of his appeal in April 1993.

We do not dispute that the record shows some missed opportunities on the part of Aoun in pursuing his rights under the immigration statutes. But the record also demonstrates that these are likely the result of poor lawyering on behalf of Aoun instead of a lack of diligence. For example, had Aoun's initial application not been withdrawn, the regulations then in effect would have allowed Aoun to continue accruing time toward the seven-year "continual physical presence" requirement after issuance of the Order to Show Cause and he would have accrued the seven years time in October 1985, well before the new rules took effect in 1996. However, even if some of the blame may be placed on Aoun and his counsel, the INS must bear most of the blame for the delay. This is not a case where the applicant "sat on his rights" or tried to evade immigration authorities for a number of years. Aoun contacted the INS shortly after he fell out of status in 1983 and he has been known to and in contact with the INS since that time. This case is not an example of the type of cases Congress was trying to address when it instituted the time stop rule. As we stated in *Ashki v. INS*, 233 F.3d 913 (6th Cir. 2000), Congress intended the time-stop provision to eliminate the incentive to prolong deportation proceedings in order to become eligible for suspension. Here, Aoun was only two months shy of the seven year requirement when the Order to Show Cause was issued in 1985, over ten years before Congress passed the 1996 Act. There is simply no evidence that Aoun was trying to delay the proceedings in any way.

In addition, since the deportation proceedings were initiated in 1985, many facts have changed in Aoun's life. Because the INS has continually denied petitioner's request based on a factual finding that he did not meet the 7-year eligibility requirement for suspension of deportation, the INS has never addressed the merits of Aoun's application, including the fact that petitioner is now the divorced father of a child who is a United States citizen and the impact that deportation would have on the child -- a factor recognized as the most important factor in determining hardship. He is educated as an engineer

and is presumably working (the record does not indicate his current employment status). He is a native of Lebanon, but, as a Palestinian, considers himself "stateless" and claims that the Lebanese government will not allow him back into the country. He has also lived in this country for nearly 25 years and appears to be a productive member of society.

Given the "indefinite" continuance of the proceedings put in place by the INS in 1988, the acknowledgment in the INS order of December 1993 that the appeal was "administratively closed" for an indefinite period of time and then the unexplained six-and-one-half year delay between "recalendaring" in April of 1993 and action on his appeal in May of 2000,[8] we find that it is appropriate to hold the time stop rule inapplicable in this case. Aoun was only two months short of the seven year requirement at that time the Show cause Order was issued and he had a reasonable expectation that he would easily meet the seven year requirement. In the next ten years, while his proceedings were continued and administratively closed, he married and had a child who is a United States citizen. During this time, his expectation that relief in the form of suspension of deportation would occur could only have increased given the length of time he had been in the country and the birth of his child. It is unfair and inequitable for the time stop rule to strip Aoun of that reasonable expectation. *See Henry v. Ashcroft*, 175 F. Supp. 2d 688, 696 (S.D.N.Y. 2001) (time stop rule had improper retroactive effect).

---

[8]While we do not imply any affirmative misconduct by the INS, we note the existence of an Order Approving a Class Action Settlement Agreement in California wherein the INS withheld or reserved granting suspension of deportation based on certain directives from the Chief Immigration Judge and Chairman of the Board of Immigration Appeals for a class of aliens who would otherwise have had suspension of deportation hearings before the time-stop rule became effective in April 1997. *Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d 1029 (N.D. Cal. 2002).

**IV.**
*Other Issues*

**A. *Asylum***

Aoun did not file a timely appeal of the Board of Immigration Appeals' denial of Petitioner's asylum application so we are without jurisdiction to review the denial. The Board rendered its final decision on Aoun's asylum application on June 9, 2000. A petition for judicial review must be filed within 30 days. The fact that Aoun had 90 days to file a motion to reopen or reconsider the suspension of deportation order does not change this requirement. The time limits for judicial review are mandatory and jurisdictional. *Stone v. INS*, 514 U.S. 386, 394, 405 (1995).

**B. *Repapering***

"Repapering" is the discretionary termination of deportation proceedings and the reinstitution of removal proceedings. § 309(c)(3) of the 1996 Act (codified at 8 U.S.C. § 1101 note (2000).) Because the Board of Immigration Appeals did not address this issue in its order, we decline to review it here and Petitioner is free to raise this issue again on remand.

For the foregoing reasons, we reverse the decision of the Board of Immigration Appeals and remand for further proceedings not inconsistent with this opinion.