

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2006

# Castello-Diaz v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4457

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Castello-Diaz v. Atty Gen USA" (2006). *2006 Decisions*. Paper 1267.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1267

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 03-4457 & 05-3166

ABEL CASTELLO-DIAZ,
Petitioner

v.

*ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

(*Substituted pursuant to Rule 43(c), Fed. R. App. P.)

On Petition for Review of a Decision of the
Board of Immigration Appeals
(BIA No.  A29 109 758)
(Immigration Judge:  Honorable Craig DeBernardis)

No. 03-4457
Submitted Pursuant to Third Circuit LAR 34.1(a)
March 10, 2005

No. 05-3166
Submitted Pursuant to Third Circuit LAR 34.1(a)
July 14, 2005

Before:  SCIRICA, *Chief Judge*, ROTH and ALDISERT, *Circuit Judges*

(Filed April 14, 2006)

## OPINION OF THE COURT

SCIRICA, *Chief Judge*.

Petitioner Abel Castello-Diaz appeals the final order of the Board of Immigration

Appeals ("BIA") entered on November 4, 2003.[1]  We will deny the petition.

### Background

Castello entered the United States on May 3, 1986.  In 1991, the Immigration and

Naturalization Service ("INS")[2] commenced deportation proceedings against petitioner

---

[1]Also before this Court is Castello-Diaz's Petition for Writ of Habeas Corpus, filed in the Eastern District of Pennsylvania, No. 05-3166.  Pursuant to the Real ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (2005), habeas corpus petitions brought by aliens challenging an order of removal, and pending as of May 11, 2005, are to be converted to petitions for review and transferred to the appropriate Court of Appeals.  *See* Real ID Act, Pub. L. 109-13, Div. B, Title I, § 106(c).  Per Castello-Diaz's request (in his Motion to Consolidate and to Remand Selected Issue to the District Court), because his habeas petition and his petition for review raise substantially similar issues, the cases are hereby consolidated.

Additionally, Castello-Diaz requests that we examine whether 8 U.S.C. § 1229b(d) has been properly construed, and argues that its impact on 8 U.S.C. § 1254(a) (repealed) creates an "absurd result" that is "not in the interests of justice or fairness."  Because the issue was not raised in either his habeas petition or his petition for review, and because it is unclear on what basis Castello-Diaz asks us to reinterpret 8 U.S.C. § 1229b(d), we will not address the issue.

Finally, Castello-Diaz requests that we withhold our decision in No. 03-4457, and remand No. 05-3166 to the District Court.  For reasons stated below, we will deny both requests.

[2]On March 1, 2003, the INS ceased to exist and its functions were transferred to the Bureau of Citizenship and Immigration Services within the Department of Homeland Security.  *See* Homeland Security Act, 6 U.S.C. § 271, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

through issuance of an Order to Show Cause ("OSC"), charging him with deportability under 8 U.S.C. § 1251(a)(2) for remaining in the United States longer than permitted. A final hearing was scheduled before Immigration Judge Robert D. Vinikoor for December 12, 1991.

At the hearing before IJ Vinikoor, petitioner conceded deportability and his case was transferred to IJ Gossart in the Immigration Court in Baltimore, Maryland. An individual calendar hearing was scheduled for April 24, 1992. This hearing was then rescheduled, by IJ Gossart, for July 21, 1992.

On July 21, 1992, IJ Gossart denied petitioner's application for suspension of deportation, on the grounds that he was statutorily ineligible for suspension under former 8 U.S.C. § 1254(a)(1)[3] due to petitioner's 1988 conviction for retail theft. Castello appealed this order to the BIA on July 23, 1992.

On December 9, 1995, the BIA remanded petitioner's case to the Immigration Court because during the time his case was pending before the BIA, petitioner had become eligible for suspension of deportation under 8 U.S.C. § 1254(a).[4] On February

_____

[3]Section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1), was repealed by the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996)

[4]An alien was eligible for suspension of deportation under former section 1254(a) upon showing: (1) he had been "physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [the] application," (2) he was a "person of good moral character," and (3) deportation would result in "extreme hardship" to the alien or an immediate family member who was a U.S. citizen or lawful permanent resident. INA § 244(a)(1), 8 U.S.C. § 1254(a)(1) (repealed).

23, 1996, IJ Debernardis explained to Castello that he was re-eligible for suspension of deportation due to his accrual of seven years of continuous presence in the United States, and a hearing on the merits was set for May 15, 1996. On May 15, 1996, IJ Debernardis rescheduled the hearing for July 23, 1996. On July 23, 1996, IJ Debernardis rescheduled the hearing again, this time for October 25, 1996.[5] By the date of Castello's hearing in October of 1996, Congress had enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996).

At the October 25, 1996 hearing, the INS challenged petitioner's eligibility for suspension under newly enacted § 309(c)(5) of IIRIRA, which prevented an alien from accruing "continuous physical presence" following service of a notice to appear.[6] Castello was served with an OSC in 1991, approximately four years and nine months after entering the United States. IJ Debernardis reserved his ruling on the INS's challenge and allowed petitioner to present all evidence in support of his application for suspension. The parties were directed to submit memoranda regarding application of IIRIRA § 309 to petitioner's application for suspension of deportation.

---

[5]There is no evidence that Castello requested re-scheduling. All changes to the date of his hearing appear to have been initiated by the court.

[6]Prior to the enactment of IIRIRA, charging documents which began deportation proceedings were called Orders to Show Cause. As part of the change in the overall scheme of immigration law, Congress changed the name of this document to a "notice to appear." 8 U.S.C. § 1229(a).

4

On September 27, 1997, almost a year after petitioner's hearing, the IJ informed the parties that he had reserved decision pending review of *In re N-J-B-*, 21 I .& N. Dec. 812 (BIA Feb. 20, 1997), in which the BIA held service of an OSC ended an alien's period of continuous physical presence in the United States. Because the Attorney General had vacated the *N-J-B-* decision, however, the IJ informed the parties on September 27, 1997, that he was going to advise the Chief Immigration Judge of his desire to grant petitioner application for suspension of deportation contingent upon the availability of visa numbers. The Chief IJ, however, had ordered all suspension of deportation applications to be delayed because Congress was planning to enact new legislation clarifying IIRIRA § 309(c)(5).

On November 19, 1997, Congress enacted the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160, which clarified that, upon service of an OSC, an alien stops accruing time toward the seven-year physical presence. The IJ granted petitioner the opportunity to file a motion asserting whether he had established seven years of continuous residency in the United States despite his absence in the mid-1980s while he served in the Spanish military.

On May 3, 1999, the IJ denied petitioner's application for suspension of deportation on the grounds that he could not meet the continuous physical presence requirement:

> But for his inability to meet this requirement, the Immigration Court would have granted suspension of deportation to the respondent. His criminal conviction is

5

now more than ten years in the past. He would indeed suffer "extreme hardship" if required to depart from the United States at the present time. All of his family members live in the United States, all of whom have legal status in this country. Respondent has devoted himself to working as a practical nurse in a nursing home for many years, thoroughly integrated himself into the community of the United States, and provided good works for the community as well. With the exception of the one year that he spent in the Spanish army, the respondent has lived in the United States for the past 25 years. All of his formative experiences have been in this country. Deportation from the United States at this stage in his life will indeed be an "extreme hardship" for him. Nevertheless, the respondent is unable to meet the continuous physical presence requirement of the law.

Immigration Court, May 3, 1999 (J.A. at 14-15).

Pursuant to 8 C.F.R. § 1003.1(e)(4) (2003), on November 4, 2003, the BIA affirmed without opinion the IJ's decision that Castello was ineligible for suspension of deportation.[7] The oral decision of the IJ is the final agency determination. *See* 8 C.F.R. § 1003.1(e)(4)(ii). Castello filed a timely petition of review in this court. We have jurisdiction under 8 U.S.C. § 1105(a) as amended by IIRIRA § 309(c)(4).

### Standard of Review

When the BIA affirms without opinion under 8 C.F.R. § 1003.1(e)(4), we review the IJ's opinion. *Dia v. Ashcroft*, 353 F.3d 228, 245 (3d Cir. 2003) (en banc). We review factual findings for substantial evidence and legal determinations de novo. *See Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004).

---

[7]"Suspension of deportation" was a form of relief from deportation prior to the passage of IIRIRA. Section 308(b)(7) of IIRIRA eliminated "suspension of deportation," and § 304 created a new form of relief known as "cancellation of removal." Because Castello's proceedings were initiated prior to the effective date of IIRIRA, suspension of deportation was the type of relief potentially available to him at that time.

**Discussion**

Castello claims that the IJ erred in its application of IIRIRA's "stop-time" provisions to the calculation of his continuous physical presence in the United States. According to petitioner, the delays in his deportation proceedings—which he claims were caused entirely by the INS—resulted in application of more stringent calculation standards than would have been applied had his case been evaluated on the merits when it was first scheduled for hearing. If the IJ had not repeatedly rescheduled his hearing, Castello argues, his case would have been decided under the pre-IIRIRA and pre-NACARA rules. Under these rules, his application for suspension of deportation would have been granted. He believes the Immigration Court's delays, therefore, violated his due process rights by effectively denying him relief which would have otherwise been available to him.

I.

Prior to 1996, § 244(a) of the INA gave the Attorney General broad discretion to grant suspension of deportation to illegal aliens who satisfied certain requirements. *See* 8 U.S.C. § 1254(a) (1994) (repealed 1996). "Suspension of deportation" was available to aliens who could demonstrate seven years continuous physical presence in the United States, good moral character, and prospective "extreme hardship" to himself or to his immediate family members upon his removal. *Id.* One of the defects of § 244's discretionary relief was that it encouraged illegal aliens to prolong their deportations

7

proceedings, in order to accrue seven years of residency in the United States and then apply for suspension of deportation.

With the enactment of IIRIRA in 1996 Congress made several significant changes to the immigration laws, including limiting the availability of discretionary relief from deportation. Particularly relevant to this case, IIRIRA limited the availability of "suspension of deportation." Congress replaced "suspension of deportation" with "cancellation of removal" and made the eligibility requirements somewhat stricter, changing the required period of physical presence from seven to ten years. *See* 8 U.S.C. § 1229b(b)(1)(A).[8]

A key change in immigration law under IIRIRA concerns how to calculate the time of an alien's "continuous physical presence" in the United States for purposes of eligibility for cancellation of removal. Prior to the enactment of IIRIRA in 1996, accrual of "continuous physical presence" began upon the alien's entry into the United States and

---

[8]The full text of 8 U.S.C. § 1229b(b)(1) reads:
> The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien—(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (B) has been a person of good moral character during such period; (C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title (except in a case described in section 1227(a)(7) of this title where the Attorney General exercises discretion to grant a waiver); and (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8

continued to accrue during deportation proceedings. Under IIRIRA, however, the initiation of removal proceedings by the INS "stops the clock"[9] on an alien's accrual of "continuous physical presence." This change was specifically designed to eliminate the problem of aliens prolonging their deportation proceedings in order to satisfy the continuous physical presence requirement. IIRIRA § 309(c)(5) now provides that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title" or when the alien is convicted of one of several specified offenses, "whichever is earliest." 8 U.S.C. § 1229b(d)(1); *see also* NACARA § 309(c)(5) (amending IIRIRA § 309 to clarify that the new accrual rules applied to proceedings initiated by way of an Order to Show Cause, in addition to those initiated by service of a Notice to Appear). This is referred to as the "stop-time" rule.

Deportation proceedings pending at the time of IIRIRA's enactment were generally excluded from the Act's changes. Certain provisions, however, were made

---

[9]Section 1229b(d)(1), titled "Termination of Continuous Period," provides as follows:
For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) except in the case of an alien who applies for cancellation of removal under subsection (b)(2) of this section, when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest.
8 U.S.C. § 1229b(d)(1).

applicable to pending cases as well as new cases. Section 309(c)(5) of IIRIRA, as modified by section 203(a)(1) of NACARA (Transitional Rules With Regard To Suspension Of Deportation), states in relevant part that the stop-time rule "shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." IIRIRA was enacted September 30, 1996 and took effect April 1, 1997. NACARA's amendments to it were effective "as if included in the enactment" of IIRIRA. NACARA § 203(f); 8 U.S.C. § 1101 note (Supp. IV 1998).

The text of these statutes establishes Congress's intent to apply the stop-time rule to all cases, including those—like Castello's—which were pending as of September 30, 1996. NACARA § 203(f); *see also* "Explanatory Statement of the Senate Committee on Appropriations," 143 Cong. Rec. S12658-01, S12660 (1997) ("Section 203 modifies certain transition rules established by IIRIRA with regard to suspension of deportation and cancellation of removal. The changes state that the 'stop time' rule established by that Act in section 240A of the INA shall apply generally to individuals in deportation proceedings before April 1, 1997, with certain exceptions."). Accordingly, for deportation proceedings pending on September 30, 1996, accrual of "continuous physical presence" in the United States for purposes of suspension eligibility ended upon service of an OSC.

II.

The INS initiated deportation proceedings against Castello in the winter of 1991 by service of an Order to Show Cause. The IJ reasoned that because IIRIRA's stop-time rule applied to Castello, the OSC stopped the clock on his accrual of continuous physical presence in the United States. Because only four years had passed at the time proceedings commenced, the Immigration Judge found Castello ineligible for suspension of deportation under INA § 244(a) as amended by IIRIRA § 309(c).

Petitioner's primary argument on appeal involves the delays which occurred during his deportation proceedings. Had his hearings proceeded as scheduled, he claims, he would have been evaluated under the more lenient rules in place prior to enactment of IIRIRA. He cites *Aoun v. I.N.S.*, 342 F.3d 503 (6th Cir. 2003), for support.

In *Aoun*, the INS commenced deportation proceedings in August 1985 against Nemer Ahmad Aoun, an illegal alien who entered the United States in October 1978. After four years of proceedings, his case was administratively closed by the BIA. The INS moved to re-calendar the appeal in late 1993. In June 2000, the BIA reinstated the proceedings and dismissed his appeal. Aoun moved to reopen his application for suspension of deportation, which was summarily denied by the BIA on grounds that, under the IIRIRA, his continuous physical presence in the United States ended with service of the OSC on August 15, 1985. Due to his failure to satisfy the continuous

11

presence requirement, the BIA found him ineligible for suspension.  *Aoun*, 342 F.3d at 504–05.

The Sixth Circuit reversed, noting that the lengthy delays in his case, which caused his eligibility to be evaluated under stricter rules, were not his fault:

> Had Aoun's application not been delayed by an "administrative closure" of his application by the INS in the late 1980s, he would have had his application ruled on well before the new rules took effect in 1997 and he would have been subject to the former rule that allowed him to accrue time towards continuous physical presence during the pendency of the proceedings. . . . As a result of the INS's administrative closure of Aoun's appeal, he was denied the benefit of the earlier, more lenient rules concerning accrual of time towards continual physical presence in the United States.  Because the administrative closure was not the fault of Aoun, he should not suffer the extremely adverse results that flowed from that decision.

*Id.* at 507.  Castello argues the reasoning of *Aoun* compels a similar result in his case.

Aliens in removal proceedings are entitled to due process, though the procedural protections accorded to them in that context "measure less than the panoply available to a criminal defendant."  *United States v. Torres*, 383 F.3d 92, 103 (3d Cir. 2004) (citing *Dia v. Ashcroft,* 353 F.3d 228, 238-39 (3d Cir.2003) (en banc)).  In the removal context, "due process requires that an alien who faces [removal] be provided (1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard."  *United States v. Lopez-Ortiz,* 313 F.3d 225, 230 (5th Cir. 2002) (citing *Kwong Hai Chew v. Colding,* 344 U.S. 590, 597-98 (1953)).  Castello does not contend he was denied any of these.  Rather, he argues that the repeated delay of his

12

merits hearing ultimately denied him due process by subjecting him to newer—and more stringent—eligibility rules.

But cancellation of removal relief is discretionary, and it is well-established that no due process violation arises from the denial of discretionary relief. In *United States v. Torres*, this Court joined our sister circuits in holding that "because discretionary relief is necessarily a matter of grace rather than of right, aliens do not have a due process liberty interest in consideration for such relief." 383 F.3d at 104. Castello had no "right" to relief from deportation; thus denial of such relief cannot rise to the level of a due process violation. *See also Pinho v. I.N.S.*, 249 F.3d 183, 189 (3d Cir. 2001) (suspension of deportation is discretionary relief that does not impair any vested rights and does not give rise to due process violations); *Tefel v. Reno*, 180 F.3d 1286, 1301 (11th Cir. 1999) ("No constitutionally protected interest arises from the INS's actions in granting or denying applications for suspension because the Attorney General exercises 'unfettered' discretion over applications for suspension. Therefore, regardless of the ultimate disposition of an application for suspension of deportation, Plaintiffs do not possess a constitutionally protected interest in their expectancy of receiving suspension.").

### III.

Next, Castello claims that he was denied due process and equal protection by the Chief Immigration Judge's directive that decisions in cases pending in October 1997 be reserved until November 14, 1997, due to the possibility of congressional legislation

13

clarifying IIRIRA § 309(c).  With respect to Castello's due process claim, our holding in Section II controls.  Because Castello had no constitutionally protected interest in suspension from deportation, a directive from the Chief Immigration Judge in light of pending legislation cannot operate to deprive appellant of due process.

Castello also claims he was denied equal protection under the law because other aliens had their cases heard and ruled on between February 1996 and October 1997, when his case was undergoing delay.  But the record contains no evidence that Castello's application for suspension of deportation was treated differently than were the applications of other similarly-situated applicants.  To the contrary, the Chief IJ's directive applied to all applications for suspension of deportation pending immediately prior to the enactment of NACARA.

In light of the dramatic changes wrought on the immigration laws by the enactment of IIRIRA and by the imminent enactment of NACARA, the Chief IJ necessarily had to have flexibility in formulating a case management plan for those applications pending in the Fall of 1997.  The Equal Protection Clause requires only that the Chief IJ's directive rationally further a legitimate governmental interest, *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439–41 (1985), which we believe it does.  Accordingly, we find no violation of Castello's rights under the Equal Protection Clause.[10]

_____

[10]On a related issue, Castello-Diaz requests that we withhold our decision and remand this issue to the District Court in order for the parties to present further evidence that the
(continued...)

14

IV.

A.

In the alternative, Castello claims the IJ erred by not counting the seven years'

continuous presence he accrued subsequent to the initial issuance of the OSC in 1991.

Assuming the stop-time provision applies to him, Castello argues that it does not preclude

the accumulation of a new period of seven years, beginning in 1991 and going forward.

We disagree. Three cases inform our analysis.

In *In re Mendoza-Sandino*, 22 I. & N. Dec. 1236 (BIA Feb. 23, 2000), Sandra

Carolina Mendoza-Sandino entered the United States on February 28, 1986, and was

served with an Order to Show Cause and an arrest warrant the next day. By the time her

---

[10](...continued)
Chief IJ's interference deprived Castello-Diaz of due process, and claims that our
jurisdiction to order the parties to provide further evidence is barred under 8 U.S.C. §
1252(a)(1). Castello-Diaz argues that, because the issue he raises here is "the same issue"
raised in a class action settlement, *see Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d
1029 (N.D. Cal. 2002), we should give Castello-Diaz the opportunity to reach the same
resolution reached there.

     We disagree with Castello-Diaz for two reasons. First, the REAL ID Act, Pub. L.
109-13, Div. B, Title I, § 106(c), limits the district courts' habeas jurisdiction over
removal orders. *See Kamara v. Att'y Gen.*, 420 F.3d 202, 210 (3d Cir. 2005) ("[I]t is
readily apparent, given Congress' clear intent to have all challenges to removal orders
heard in a single form (the court of appeals), that those habeas petitions that were pending
before this Court on the effective date of the REAL ID Act are properly converted to
petitions for review and retained by this Court.") (citing *Bonhometre v. Gonzales*, 414
F.3d 442 (3d Cir. 2005)). Second, even assuming Castello-Diaz could be entitled to a
resolution obtained by settlement in the Court of Appeals for the Ninth Circuit (and not
through a judicial resolution of an outstanding question of law), the settlement outcome in
*Barahona* was tied to an internal directive concerning §§ 304(a)(3) and 309(c)(7) of the
IIRIRA—provisions not at issue in this case.

15

application for suspension of deportation was heard by an Immigration Judge in 1996, she had accrued seven years of continuous physical presence.  An en banc panel of the BIA held that an alien may not accrue the required seven years' continuous physical presence after service of an Order to Show Cause:

> The language of section 240A(d) makes it clear that Congress appreciated the difference between a "break" in continuous physical presence and the "end" of continuous physical presence.  Congress has distinguished between certain actions that "end" continuous physical presence, i.e., service of a charging document or commission of a specified crime, and certain departures from the country that only temporarily "break" that presence.  Service of an Order to Show Cause or a notice to appear is not included as an interruptive event under section 240A(d)(2), which merely breaks continuous physical presence.  Rather, under section 240A(d)(1), such service is deemed to end an alien's presence completely.  Therefore, a reading of section 240A(d)(1) that would allow an alien to accrue a new period of continuous physical presence after the service of a charging document is not supported by the language of either section 240A(d)(1) or (2).

*Id.* at 1240.  The BIA also set forth the legislative history of the IIRIRA, concluding that its holding in *Mendoza* was consistent with the goals of the Act:

> The House and Conference Reports make it clear that the legislators intended to remove the incentive for aliens to prolong their cases in the hope of remaining in the United States long enough to be eligible for relief from deportation.  Therefore, reading section 240A(d)(1) to allow an alien to accrue a new period of continuous physical presence after the issuance of a charging document would be contrary to the intent of Congress as expressed in the legislative history of the IIRIRA.

*Id.* at 1243 (internal citations omitted).

Departing from this bright-line rule, the BIA in *In re Ignacio Cisneros-Gonzalez*, 23 I.&N. Dec. 668 (Sept. 1, 2004), created an exception for aliens served with charging documents on separate occasions.  Ignacio Cisneros-Gonzalez was served with an Order

to Show Cause charging him with deportability on December 28, 1990.  He was deported to Mexico on January 10, 1991, and he returned (illegally) to the United States the next day.  Ten years later he was again served with charging documents by the INS (now DHS).  Gonzalez requested cancellation of removal, contending he satisfied the 10 years continuous physical presence requirement of section 240A.  Applying *Mendoza*, the Immigration Judge denied his application.  The BIA reversed.

The BIA in *Cisneros* framed the issue narrowly: "whether an alien who departs the United States after being served with a valid charging document can, upon his subsequent return to the United States, accrue a period of continuous physical presence—measured from the date of his return—so as to demonstrate eligibility for cancellation of removal."  *Id.* at 669.

Relying heavily on both the statute's structure and the legislative history of the stop-time rules, the BIA in *Cisneros* held an alien may accrue a second period of continuous physical presence under section 1229b(b)(1).  *Id.* at 672.  The BIA emphasized that Cisneros-Gonzalez was involved in a second round of removal proceedings, and held the "stop-time rule was not intended to extend to charging documents issued in earlier proceedings."  *Id.* at 672.  Because service of the clock-stopping notice to appear applies only to those notices "served in the proceedings in which the alien applies for cancellation of removal," the BIA held that a second clock

17

had started and Gonzalez had demonstrated the requisite continuous physical presence under § 1229b(b)(1). *Id.*

Although the en banc panel in *Cisneros* did not explicitly overrule *Mendoza*, it did interpret *Mendoza* to hold that it "resolved the question whether service [of an OSC] precluded an applicant for relief from accruing a qualifying period of continuous physical presence *in the proceedings* that arose from service of that charging document." *Id.* at 670 (emphasis added). By imposing an "in the proceedings" requirement that effectively limits the application of *Mendoza*, the *Cisneros* rule left open the possibility that, in limited instances, section 1229b permits multiple periods of "continuous physical presence." We considered one such instance in *Okeke v. Gonzales*, 407 F.3d 585 (3d Cir. 2005).

Anderson Jude Okeke, a Nigerian citizen, entered the United States in 1981 on a student visa. In 1983 Okeke was arrested for possession of marijuana and sentenced to five years' probation. In 1984, after a trip to Nigeria, Okeke was lawfully readmitted to the United States. He lived in the U.S. without interruption since then. He and his wife had six children, all of whom are U.S. citizens.

In 1997 the INS served Okeke with a Notice to Appear, charging him with removability for failure to comply with the terms of his student visa. He applied for cancellation of removal. The IJ found he had failed to establish the required seven years of continuous physical presence, however, because his controlled substance offense in

18

1983 "stopped the clock" on his accrual. *See* 8 U.S.C. § 1229b(d)(1). Because Okeke arrived in the United States in 1981 and committed the offense in 1983, the IJ held he accrued only two years of continuous physical presence under § 240A. The IJ denied his application. On appeal, the BIA affirmed. This Court reversed.

The majority—in two separate opinions—held Okeke was entitled to relief. But Judges Garth and Ambro reached this result via different routes. Judge Garth reasoned that Okeke's lawful re-entry into the United States in 1984, at which time he was still covered by his student visa, "re-started" the clock for purposes of "continuous physical presence." *Okeke*, 407 F.3d at 590 (Garth, J.). Judge Ambro, concurring, focused instead on the statute's plain language and Congress' intent, stating that *Mendoza* was incorrectly decided. *See id.* at 597 (Ambro, J., concurring) ("Congress intended in § 1229b(d)(1) to allow the continuous physical presence clock to restart after the commission of a specified offense"). Although no single *ratio decidendi* is clear, and although each would carve out a rule that would allow for the accrual of the requisite period of time subsequent to some clock-stopping event, neither Judges Garth's nor Judge Ambro's opinion allows us to disregard *Cisneros*'s rule—that "service [of an OSC] preclude[s] an applicant for relief from accruing a qualifying period of continuous physical presence in the proceedings that arose from service of that charging document." 23 I .& N. Dec. at 670.

Adopting Judge Garth's rationale would not alter the application of *Cisneros* to this case. Interpreting the more stringent bright-line rule in *Mendoza*, Judge Garth determined it did not address "whether *lawful reentry* after commission of an offense, rendering the alien inadmissible, restarts the clock." *Okeke*, 407 F.3d at 589 (Garth, J.). He then interpreted *Cisneros* as creating an exception to *Mendoza*, allowing "for the accrual of a new period of continuous physical presence upon an alien's reentry into the United States," and held where there is a "lawful reentry after a clock-stopping event, . . . the clock starts anew." *Id.* at 590. However, here, Castello did not leave and then reenter the country. Under Judge Garth's rationale, and applying the appropriate standard of deference, under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984), to both *Mendoza* and *Cisneros,* we are unable expand *Cisneros'* exception to the present case.

Nor would adoption of Judge Ambro's reasoning alter the application of *Cisneros*. After arguing that *Cisneros* did not apply to Okeke's case, Judge Ambro stated that he would have held *Mendoza*'s interpretation of § 1229b(d)(1)—that "the clock cannot be reset so that an alien accrues continues physical presence after the commission of a specified offense"—impermissible under *Chevron*. *Id.* at 593. Whatever the merits of this rationale, the clock did not stop for Castello because of his commission of any "specified offense" (that is, his time did not stop because of the commission of any particular crime). Instead, the clock stopped because Castello was served with one, and

20

only one, OSC, premised on his staying in the U.S. longer than permitted. *Okeke* dealt specifically with an individual convicted of a controlled substance offense, and Judge Ambro focused on *Mendoza*'s effective § 1229b(d)(1) rule, that "if you commit a specified offense you can never get cancellation of removal under § 1229(b)(b)(1)." *Id.* at 594–95. But this reasoning does not extend further than Judge Ambro's proposed holding in *Okeke*. Even were we to agree that either the bright-line rule in *Mendoza,* or the more limited rule in *Cisneros,* should not apply to instances in which an alien has committed a "specified offense," that limitation on *Mendoza*—and, by extension, *Cisneros*—would not apply here.

### B.

Applying *Cisneros*, because Castello did not accrue seven years of continuous physical presence prior to issuance of a charging document by the INS, we find no error in the IJ's calculation.

### Conclusion

For the foregoing reasons, we will deny the petition for review of the final order of deportation entered by the BIA on November 4, 2003.[11] We deny the motion to withhold

---

[11]The IJ has discretionary authority to reopen a case upon his own motion at any time pursuant to 8 C.F.R. § 1003.23(b)(1). Castello arrived in the U.S. as a minor, and has been living continuously in this country for almost twenty-one years—fifteen of which have involved litigation arising from the initial Order to Show Cause. His family lives in the United States, and he has worked as a nurse in a nursing home for several years. Even though he cannot prevail in this case, Castello seems to be an appropriate candidate for discretionary relief.

21

decision in No. 03-4475 and deny the motion to remand in No. 05-3166.